**Jane DOE, Appellant,**

v.

**DOMINION BANK OF WASHINGTON, N.A.**

**No. 91–7105.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 20, 1992.

Decided May 22, 1992.

Rehearing Denied July 7, 1992.

---

Michael B. Waitzkin, with whom Lori E. Fox and Elizabeth Langer, Washington, D.C., were on the brief, for appellant.

Joseph Michael Hannon, Jr., with whom Randell Hunt Norton, Washington, D.C., was on the brief, for appellee. John Jude O'Donnell, Washington, D.C., also entered an appearance, for appellee.

Before: RUTH BADER GINSBURG, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.

Concurring opinion filed by Circuit Judge STEPHEN F. WILLIAMS.

RUTH BADER GINSBURG, Circuit Judge:

On May 24, 1989, plaintiff-appellant, named here as Jane Doe, was raped at an office building downtown in the District of Columbia. At the time of the crime, Doe was employed in the building as a secretary for a commercial tenant. Defendant-appellee, Dominion Bank, held the master lease on the premises. The crime occurred during the workday in an unlocked office on a vacant floor. Invoking federal jurisdiction based on the parties' diverse citizenship, Doe commenced this tort action against the Bank. She alleged that the Bank, as landlord, had a duty to take reasonable measures to shield tenants and their employees from the foreseeable criminal conduct of third persons. Doe further alleged that the Bank was negligent in failing to secure vacant portions of the

building, and was on notice that the absence of adequate security during normal business hours jeopardized the safety of persons who worked on the premises.

At the close of Doe's evidence, the Bank moved for a directed verdict.[1] Concluding that Doe had not proved the foreseeability of the rape, the district court granted the motion and entered judgment as a matter of law for the Bank. Doe appeals from that judgment. The Bank defends the district court's ruling on foreseeability, and reasserts two other grounds for affirmance. First, the Bank argues that because of the exclusively commercial character of the building and of the landlord/tenant relationship, the Bank was under no duty to protect Doe from the criminal acts of third parties.[2] Second, the Bank maintains that Doe's evidence failed, as a matter of law, to establish the appropriate standard of care.[3]

We uphold the district court's determination that under D.C. case law, a commercial landlord has a duty to take reasonable measures to safeguard tenants from foreseeable criminal conduct in the common areas of the leased premises. We also uphold the district court's disposition of the standard of care issue. Doe's qualified security expert testified that the Bank, in failing to secure vacant floors and offices, did not comport with acceptable security practices for urban commercial buildings, either in D.C. or anywhere else in the country. That testimony sufficed to establish a standard of care against which the jury could measure the Bank's conduct.

We part ways with the district court, however, on the question whether Doe failed to present sufficient evidence of the foreseeability of the crime to which she fell prey. The district court refused to consider the unsecured condition of the premises as a proper factor in the determination of foreseeability. That refusal, in our estimation, missed the thrust of evolving D.C. precedent. Furthermore, the lack of evidence of prior crimes against persons in or around the building, we hold, did not "fatal[ly] flaw" Doe's case. Because we conclude that Doe presented evidence sufficient to require submission of the critical issue of foreseeability to a jury's verdict, we reverse the judgment entered as a matter of law for the Bank and remand the case for a full trial.

## I.

### Background

From November 1988 through May 1989, Jane Doe worked as a secretary for Fiscal Planning Services, Inc., a financial consulting firm with offices at 1430 K Street, N.W., a commercial building in downtown Washington, D.C. Dominion Bank held the master lease to the 1430 K St. building, and engaged Community Management Corporation (CMC) to manage the property.[4] As part of its management responsibilities, CMC received, handled, and informed the

1. Effective December 1, 1991, Rule 50 of the Federal Rules of Civil Procedure speaks only of "Judgment as a Matter of Law" and no longer employs the terms "directed verdict" and "judgment notwithstanding the verdict."

2. On the Bank's motion for summary judgment, the district court resolved in Doe's favor the question of a commercial landlord's responsibility to protect tenants from foreseeable criminal conduct. The court considered the case to present a "very challenging and a close issue ... in a circumstance that is somewhat novel," and expressed an inclination, had it the statutory authorization, to certify the issue to the D.C. Court of Appeals. *See* D.C.Code Ann. § 11–723 (D.C. Court of Appeals "may answer question of law certified to it by" the U.S. Supreme Court, a U.S. Court of Appeals, or the highest appellate court of any state).

3. In moving for a directed verdict, *see supra* note 1, the Bank argued alternatively that Doe did not adequately demonstrate foreseeability or the applicable standard of care. The district court explicitly rejected the Bank's argument that the testimony of Doe's security expert was insufficient to establish a standard of care, and therefore did not enter judgment as a matter of law on the standard of care ground.

4. The district court considered CMC to be the Bank's agent, "for the purpose of receiving notice of incidents within 1430 K Street, N.W., and for the purpose of imputing CMC's negligence to Dominion Bank." *Doe v. Dominion Bank,* CA No. 90–00597 (D.D.C. May 16, 1991) (mem. op.) at 3 n. 1. In defending against Doe's appeal, the Bank has not questioned the court's assumption of CMC's agency.

Bank of tenant complaints, including reports of security problems in the building.

In February 1989, Fred Rigney, Senior Vice President of the Bank, informed CMC that the Bank had contracted to sell the 1430 K Street property. Rigney instructed CMC not to execute any new long term leases on office space in the building, and told CMC to renew existing leases, including the lease with Fiscal Planning, only on a month-to-month basis. According to Christine Mehling, CMC's Executive Administrator, the Bank resisted authorizing expenditures for building maintenance and repairs during 1988–89, while negotiating the sale of the property. By May 1989, five of the building's thirteen floors—the third, ninth, tenth, twelfth, and penthouse floors—were vacant.

At around 8:45 on the morning of May 24, 1989, Jane Doe arrived at 1430 K Street to begin her workday at Fiscal Planning. Having unlocked the file cabinets and made coffee in the firm's offices on the eleventh floor, Doe planned to go downstairs to a nearby shop to get some tea. Doe entered the elevator on the eleventh floor. No other passenger was in the cab. She pressed the button for the lobby, but the elevator stopped on the ninth floor. Doe pushed the "door open" button to admit the next passenger. She did not know that the ninth floor was vacant at that time.

A man boarded the elevator and moved behind Doe. Grabbing her in a choke hold, the man first dragged Doe from the elevator, then down the ninth floor hallway, and through unlocked doors to a dark vacant office, where he raped and robbed her. The rape occurred at around 9:20 a.m., during regular business hours at 1430 K St. offices.

Dennis Windsor, CMC's property manager for the building, conducted an investigation of the premises on the day of the rape. Windsor found that elevators had not been programmed to bypass all vacant floors. He also came upon unlocked doors leading from the building stairwell onto floors. CMC notified Fred Rigney of Windsor's findings, and Rigney instructed CMC to "secure the elevators by locking off access to all floors in the building that are unoccupied by tenants," to "secure the stairwells by making sure that none of the floors in 1430 can be accessed from the stairwells," and to "secure the stairwell doors leading from the lobby."

Doe's complaint, filed in the district court on March 15, 1990,[5] charges that her rape was a foreseeable consequence of inadequate security in the Bank's building and demands damages for injuries Doe sustained in the assault. The Bank moved for summary judgment, arguing that D.C. law does not hold a commercial landlord liable for the criminal acts of third parties. The district court denied the summary judgment motion in an oral ruling. While characterizing the question as "challenging" and "close," the district court did not discern in D.C. Court of Appeals analyses the distinction urged by the Bank between commercial and residential leases.

At trial, Doe presented evidence, through incident reports, tenant correspondence, and other business records maintained by CMC, of thefts of personal property and business equipment from offices in the building, drug use and sexual activity in a building rest room, and tenant complaints of threatening intruders and inadequate security at 1430 K Street.[6] These records, dated from January 1987 through May 1989, showed that most of the reported thefts occurred in the period running from the winter of 1987 through the summer of 1988. The evidence of drug use and sexual activity turned up in March 1988.

During the month preceding Doe's rape, however, CMC and the Bank received a number of alerts from tenants regarding

---

5. The bases for diversity jurisdiction—the Bank's incorporation and principal place of business in the District of Columbia, Doe's Maryland residence and citizenship plus the requisite amount in controversy, *see* 28 U.S.C. § 1332—are uncontested.

6. The court admitted most of this evidence "only for the purpose of establishing notice to Dominion Bank of the reports of these incidents," and not as proof that the reported incidents actually occurred.

potential threats to employee safety in the building. On April 20, 1989, G. Mario Moreno, regional director of the Mexican American Legal Defense and Educational Fund (MALDEF), a tenant at 1430 K Street, wrote to Christine Mehling at CMC reporting the repeated appearances "over the last five months" of "a strange street person" at MALDEF's office suite. Moreno described the intruder as "approximately six feet tall, 250 pounds and ... always dressed in dirty tattered clothes." According to Moreno, the stranger's "intimidating physical size and questionable mental state create[d] concern and tension" among MALDEF's staff. Moreno reported that as the intruder's visits increased in frequency, "his demeanor [became] more aggressive." The man's unexpected appearances, in Moreno's view, put MALDEF employees "always at risk," and the necessary "constant vigilance of the door interferes with our work patterns and draws into question the safety of remaining alone in our office."

Fearful "of becoming hostages within our own office," Moreno wrote, MALDEF "urgently" requested CMC to "take affirmative steps to ensure that this office building remains secure for its tenants." Moreno recommended that CMC employ a security guard to remain on duty in the building lobby during weekday business hours, or install an intercom system with an electronic release outside MALDEF's suite. Moreno warned that "a preventive measure needs to be taken before a tragedy occurs," and reminded CMC that his letter marked MALDEF's "second notice to CMC concerning this intruder." While MALDEF had alerted the police to the intruder's presence, Moreno observed that "the response time of the police" was "too long" and "after the fact." Moreno noted that the building elevators "have a long history of not operating properly," and expressed

concern that "without a security system my staff may be confronted by this individual while in the dark stairwell."

Mehling immediately forwarded Moreno's letter to Fred Rigney at the Bank. In her cover letter, dated April 24, 1989, Mehling reported that MALDEF had "telephoned our office several weeks ago concerning a stranger's presence," and that CMC had advised MALDEF to telephone the police. Because MALDEF had expressed no concern about safety at that time, Mehling recounted, "[n]o further action was taken." Mehling asked Rigney what action the Bank planned to take, so that CMC could advise the tenant.

Rigney responded to CMC in a memo dated April 26, 1989. Rigney reported that he had visited MALDEF's suite, which "currently has a door with a lock and a doorbell to control access," and proposed the addition of "a peephole type device or glass [panel] in the door." To ensure "the security of the stairwell," Rigney suggested that a maintenance employee, Samuel Josephs, "check the stairwell every evening before he leaves work."[7] In Rigney's view, "the implementation of the above suggestions would give MALDEF the necessary comfort level in the building."

CMC relayed the Bank's proposals to MALDEF. By letter of May 19, 1989, Moreno accepted the Bank's offer to install a peephole in MALDEF's office door, but expressed his "strong[ ] belie[f]" that there remains a potential hazard to my employees outside the confines of our office." Moreno emphasized the "half-hour lapse of time between the moment Mr. Josephs leaves for the evening (approximately 4:30 p.m. ...) and when the building entrance door is controlled by the security system at 5:00 p.m."[8] During this half-hour period, Moreno observed,

---

**7.** Samuel Josephs was hired by CMC to run the elevator at 1428 K Street, a storage facility next door to 1430 K Street, and similarly leased to the Bank. While Josephs occasionally performed "miscellaneous cleaning" duties at 1430 K Street, his primary responsibilities were at 1428 K Street, and he remained principally in the lobby of the storage facility rather than at the office building.

**8.** From 5:00 p.m. to 8:00 a.m., an automated card-activated security system limited access to the entrance and elevators at 1430 K Street. Only cardholders could gain entry to the building lobby, and the elevators would permit access only to the particular floor programmed onto each card.

the building is left unsupervised, allowing any individual, however dangerous, to enter the building unnoticed. Furthermore, any individual can avoid detection by hiding on any one of the vacant floors and emerging before or after Mr. Josephs leaves.[9]

Moreno emphasized that his "safety concerns" would not be adequately addressed by "the mere installation of a peep hole," and again suggested that a security guard be employed to patrol the lobby.[10]

The Embassy of Djibouti, another tenant at 1430 K Street, also relayed concerns over building security during the period just prior to Doe's rape. In March 1989, the Embassy was burglarized. Although no office equipment or other property was reported stolen, the Embassy entrance doors were broken. Following the break-in, the Embassy telephoned CMC "regularly" to ascertain "what action the landlord intends to undertake to prevent a recurrence of the frightening incident."

Mehling wrote to Rigney on April 26, 1989, communicating the Embassy's persistent security worries. Citing the letter from MALDEF, Mehling wrote that "many of the tenants of 1430 K Street have experienced incidents which, taken together, lend credence to their grave concerns regarding the adequacy of security in the building." Mehling also noted that a former tenant had cited "lack of security as one of the precipitating factors in its decision to relocate," and recalled the "physical evidence of drug abuse and sexual activities occurring in the building" in 1988. CMC's "concern for the safety of the tenants at 1430 K Street is intensifying," Mehling wrote, and the management company "strongly urge[d] Dominion Bank to seriously consider immediate security measures."

During the week of May 18, 1989, one week before Doe's rape, the Embassy of Djibouti reported "an intruder on their floor." An internal CMC memo described the intruder as "a tall black man in unusual attire." An Embassy officer asked Samuel Josephs about the intruder, and Josephs "said that he is a 'bad man.'" The Embassy receptionist saw the same intruder on the floor later that same week, prompting the report to CMC.

To establish that the Bank fell below the applicable standard of care in providing security for the tenants of 1430 K Street, Doe presented the testimony of Anthony Potter, a security consultant. Based on Potter's extensive background and experience in the field of commercial office building security, the district court found him qualified both as "an expert in general" and "as an expert specifically to give his opinion as to the security level that is reasonable and appropriate in the District of Columbia as to 1430 K Street in May of '89." In preparing his testimony, Potter had reviewed police crime statistics for the area near 1430 K Street, CMC's records of criminal activity in the building, and the tenant complaints in CMC files; observed Moreno's trial testimony; toured the 1430 K Street property; gained a familiarity with the circumstances of Doe's rape; and read the CMC records reporting the condition of the building at the time of the rape. Based on this information, Potter testified that in his professional opinion, the security in place at 1430 K Street on May 24, 1989 did not comply with acceptable standards of commercial building security.

Asked to explain how the building fell below acceptable security standards, Potter replied:

> Very simply, the building was not properly secured in that the vacant spaces, the vacant floors, the vacant offices were

---

9. According to Mehling, Rigney's proposal that Josephs patrol the stairwells before leaving work each day was never implemented, and the Bank was so informed. Josephs was a man in his seventies, with no training in security, and, according to Mehling, "was handicapped" and "too old to perform the job" of walking up and down thirteen flights on each of two stairwells in the 1430 K Street building.

10. In addition to the evidence provided by Moreno's correspondence, Moreno testified at trial about his encounters with disturbing intruders at 1430 K Street; he said all of these incidents had occurred during regular business hours.

readily accessible to anyone who wanted to enter them. The vacant floors were not blocked off ... by access from the elevator or from the stairwell, allowing anyone who wanted to enter the building and go to one of those vacant floors to be able to do so without any effort whatsoever.

Noting the absence of "any restriction on access to the building ... during normal building hours," Potter described the unsecured condition of vacant areas as "a recipe for disaster" in "any metropolitan area."

Permitting "people who should not even be in the building to have unrestricted access to areas where they can basically commit whatever type of criminal activity they wish to totally undisturbed," Potter testified, violated "the most basic principles of security." In Potter's expert opinion, "the standard of care applicable to commercial landlords in the District of Columbia require[s] that vacant areas of commercial buildings be locked off," and that standard operating procedure "varied nowhere" in the United States. According to Potter, the Bank had failed to take "one of the simplest and cheapest" measures "to secure property."

After Doe had presented her evidence in chief, the Bank moved for a directed verdict on two grounds: Doe, the Bank contended, had failed to demonstrate that the rape was reasonably foreseeable; further, the Bank argued, Doe had failed adequately to establish the applicable standard of care. Ruling orally from the bench, the district court rejected the Bank's argument that Potter's expert testimony was insufficient to establish the standard of care; however, the court ruled dispositively for the Bank on the issue of foreseeability.

The district court supplemented its oral ruling with a memorandum opinion. *See Doe v. Dominion Bank*, CA No. 90–00597 (D.D.C. May 16, 1991) (mem. op.). The court stressed Doe's failure to present evidence that 1430 K Street was located in a "high-crime area," or to introduce proof of "crimes, especially crimes against persons, in the vicinity" of the office building. *Id.* at 8–9. The lack of "evidence of any previ-

ous crimes against persons occurring in or around 1430 K Street," in the court's view, was a "fatal flaw" in Doe's case. *Id.* at 11.

The CMC incident reports, the court said, indicated only "a number of property crimes in the summers of 1987 and 1988," and use of "the third floor bathroom for unauthorized purposes in the spring of 1988." *Id.* at 13. Moreno's letters, according to the court, "presented no *fact* from which Dominion Bank or this Court could determine foreseeability." *Id.* (emphasis in original). The intruder, the court observed, never "struck any employee or even said anything threatening to any of the MAL-DEF employees." *Id.* Neither Moreno's correspondence nor the other evidence of criminal activity at 1430 K Street, the court concluded, sufficed to put the Bank on notice that a "serious assault of some kind" was foreseeable. *Id.*

In opposing judgment in the district court for the Bank, Doe placed heavy weight on the evidence that vacant areas of the building were unsecured and accessible to intruders. The district court, however, considered the condition of the premises as relevant only to the standard of care, not to the foreseeability of the crime. The court declared that the landlord's negligence "in failing to respond, even minimally," was not a proper consideration "in determining the foreseeability of a particular criminal event." *Id.* at 12–13.

## II.

### Duty of a Commercial Landlord

■ "As a general rule, a private person does not have a duty to protect another from a criminal attack by a third person." *Kline v. 1500 Massachusetts Ave. Apt. Corp.*, 439 F.2d 477, 481 (D.C.Cir.1970). This court in *Kline*, however, determined that "the rationale of this very broad general rule falters when it is applied to the conditions of modern day urban apartment living." *Id.* The *Kline* court consequently declared it the duty of residential landlords to exercise reasonable care to protect tenants from foreseeable criminal conduct in common areas of the leased premises, *i.e.*,

areas exclusively within the landlord's control. *Id.*

The D.C. Court of Appeals, in *Ramsay v. Morrissette*, 252 A.2d 509 (D.C.1969), had previously recognized a similar duty. The court in *Ramsay* reversed a summary judgment entered against a tenant in a premises liability tort action. The tenant had sued her landlord for injuries sustained in an assault by an intruder who had forced his way into her apartment. The court acknowledged that generally "a landlord has no duty to protect a tenant, or a tenant's property, from criminal acts of third persons." *Id.* at 512. But the court also recited the settled principle that "a landlord's duty to those persons legally on the premises is to use reasonable care with respect to those portions of a building over which he retains control." *Id.* at 511. While declining to "define the limits of a landlord's liability to prevent, deter, or control criminal conduct around or within the leased premises," the *Ramsay* court held that

> [t]he traditional duty of reasonable care under all the circumstances would, of course, apply to those parts of the building used in common by all tenants where it can be shown that the landlord was aware of a dangerous situation and took no action either to remedy the situation or to warn the tenants of the danger.

*Id.* at 512.

In subsequent decisions, the D.C. Court of Appeals has consistently applied the principle of *Ramsay* and *Kline* in the context of residential leases. *See Graham v. M & J Corp.*, 424 A.2d 103, 105 (D.C.1980) (citing *Ramsay* and *Kline*); *Spar v. Obwoya*, 369 A.2d 173, 176–77 (D.C.1977). The D.C. Court of Appeals apparently has not squarely resolved whether the same duty to protect tenants from foreseeable criminal conduct applies to commercial landlords. The court noted no distinction between commercial and residential leases, however, when it reviewed a decision concerning the duty of a landlord in relation to a commercial tenant in a building that also contained residential apartments. *See Si-*

*nai v. Polinger Co.*, 498 A.2d 520, 529 (D.C.1985).

The plaintiff in *Sinai* was a doctor who leased office space in a mixed-use apartment building. *Id.* at 522. Sinai had sued his landlord for injuries incurred in an attack by an armed co-tenant. In an appeal from a jury verdict against him, Sinai raised as one claim of error the trial court's refusal to give a proffered instruction. Sinai had asked the trial judge to instruct the jury that the landlord "must be held to a professional negligence standard: that of a reasonable certified property manager." *Id.* at 528. Upholding the trial court, the Court of Appeals stated: "Even in cases like this one, where the law imposes a special duty upon the landlord to protect his tenant from foreseeable acts of third parties, ... 'in the last analysis the standard of care is the same—reasonable care in all the circumstances.'" *Id.* at 529 (citing *Kline, Graham,* and *Spar*).

The Bank attempts to distinguish *Kline,* arguing that the case turned on the warranty of habitability implied in residential leases, and that the warranty was based on provisions of the housing code which do not apply in the commercial setting. *See* Brief for Appellee at 19–23. The D.C. Court of Appeals, however, did not rely on housing regulations or an implied warranty rationale in holding landlords subject to a duty of reasonable care to protect tenants from foreseeable crimes in common areas. *See Graham,* 424 A.2d at 106–07 (local Housing Code regulations cited as relevant to jury's determination of what safety or security measures are reasonable under all the circumstances, not as basis for imposing on landlord duty of reasonable care); *Spar,* 369 A.2d at 176–77; *Ramsay,* 252 A.2d at 511–13.

According to the D.C. Court of Appeals, "[t]he controlling reason for imposing a tort duty in *Kline* was that the apartment tenant would find it impossible to provide the security in common areas." *Graham,* 424 A.2d at 106. The inability of an individual tenant to control the security of common hallways, elevators, stairwells, and lobbies does not depend on whether the

building is commercial or residential. While the necessity of public access may complicate the provision of security in commercial buildings, this factor is relevant to the appropriate standard of care rather than to the existence of a duty. *See Graham,* 424 A.2d at 106 ("[w]hat measures are reasonable under the circumstances is determined by a jury assessment of protective measures taken in buildings of similar character and class"; suggesting that appropriate security measures in a low-rent two-family duplex might be less than those required in a multiple unit apartment building).

In sum, the D.C. landlord-tenant premises liability tort cases offer no principled ground on which to disallow the claim in question in a commercial setting while recognizing that the claim could be advanced were the building residential or mixed. We therefore project, as did the district court, that under D.C. law, a commercial landlord must exercise reasonable care to protect tenants from foreseeable criminal conduct occurring in common areas within the landlord's control.

### *Foreseeability*

It is axiomatic that under a negligence regime, one has a duty to guard against only foreseeable risks. Once it is established that duties, generally, are owed to one party (such as a commercial tenant) by another (such as a commercial landlord), the foreseeability of the risk at issue in a particular case might seem more applicable to determining whether the standard of care was breached. The D.C. Court of Appeals has stated, however, that "[f]oreseeability is the key element in establishing the landlord's duty." *Graham,* 424 A.2d at 105. We do not, in this diversity case, attempt to resolve, as surrogate for the D.C. Court of Appeals, the analytical framework under which foreseeability is considered. The following discussion of the foreseeability of the harm, in any case, should suffice whether placed under a "duty" or a "standard of care" rubric.

D.C. law imposes a heightened standard of foreseeability on plaintiffs seeking to hold a landlord liable for injuries resulting from a criminal act. *See District of Columbia v. Doe,* 524 A.2d 30, 33 (D.C.1987); *Lacy v. District of Columbia,* 424 A.2d 317, 323 (D.C.1980) ("[B]ecause of the extraordinary nature of criminal conduct, the law requires that the foreseeability of the risk be more precisely shown."). "[T]his heightened showing does not require previous occurrences of the particular type of harm, but can be met instead by a combination of factors which give defendants an increased awareness of the danger of a particular criminal act." *District of Columbia v. Doe,* 524 A.2d at 33.

While the D.C. decisions are hardly crystalline in their treatment of foreseeability, the cases are not cloudy on this basic point: the condition of the premises is a critical factor in assessing the foreseeability of criminal conduct. The D.C. Court of Appeals has consistently factored evidence of lapsed security conditions into the foreseeability equation. *See District of Columbia v. Doe,* 524 A.2d at 34 ("deficient school security—the open rear gate, broken doors, malfunctioning intercom, and presence of adult males who freely roamed throughout the school" were among factors that "could be viewed by reasonable factfinders as enhancing the foreseeability of danger from intruders"); *Graham,* 424 A.2d at 105 (allegation that outer door of building did not close properly was among factors from which jury might conclude arson was foreseeable); *Spar,* 369 A.2d at 177 (evidence of "continuing inadequacy of the front doorway of the apartment to keep out unauthorized persons from the building" cited among bases for allowing the case to go to the jury).

The district court, however, misperceived this key aspect of D.C. law when it excluded from the foreseeability calculus Doe's evidence of the unsecured condition of vacant common areas at 1430 K Street. *See* mem. op. at 12–13. The court regarded the easy access to vacant floors and offices through unlocked stairwell doorways and unprogrammed elevators as relevant only to "the reasonableness of the landord's response." *Id.* at 13. "Before reaching whether the landlord was negligent in fail-

ing to respond, even minimally," the court reasoned, it "must first determine whether the landlord had a duty to respond at all given the facts the landlord knew or should have known." *Id.* at 12–13. The court therefore "reject[ed] any analysis that factors in a question of reasonableness of the landlord's response in determining the foreseeability of a particular criminal event." *Id.* at 13.

The question whether the Bank acted reasonably in failing to secure the vacant areas of the office building, we agree, does bear on the determination whether the Bank measured up to the applicable standard of care. But this by no means precludes consideration of the condition of the premises in assessing foreseeability. The choice is not "either/or," as the district judge may have thought it was. Under D.C. precedent, if the condition of the premises is among "the facts the landlord knew or should have known," mem. op. at 12–13, then the condition is relevant to a determination whether crime was foreseeable.

Furthermore, where easy access to vacant areas is shown, the risk of crime is evident, and it is artificial, given this setting, to distinguish, as the district court did, between danger to property and persons. The district court properly followed D.C. law in holding that "evidence of previous sexual attacks in the building" was not essential to a factfinder's determination that Doe's rape was foreseeable. Mem. op. at 10 (citing *District of Columbia v. Doe,* 524 A.2d at 33). While declining to require proof of a prior occurrence of the particular criminal offense, however, the district court identified the lack of evidence of "crimes against persons occurring in or around 1430 K Street" as a "fatal flaw" in Doe's case. Mem. op. at 11. This insistence that Doe had to show the previous occurrence of a particular type of crime, *i.e.* a crime against a person, seems to us at odds with D.C.'s multi-factored, anti-talismanic approach to foreseeability.

The district court's emphasis on Doe's failure to prove that 1430 K Street was located in a high crime neighborhood reflects a similar rigidity. Mem. op. at 8–9. The reputation of a neighborhood as a high crime area, *see Graham,* 424 A.2d at 104–05, and statistics on criminal activity in the environs surrounding the site of an assault, *see District of Columbia v. Doe,* 524 A.2d at 32; *Spar,* 369 A.2d at 175, no doubt are indicators of foreseeability. No D.C. case, however, has established crime statistics, or testimony as to the reputation of an area for criminal activity, as an essential evidentiary prerequisite to a finding of foreseeability. There was ample evidence here that the Bank had incessant notice of criminal activity—including theft, burglary, drug use, and possibly prostitution—ongoing at 1430 K Street during the two and a half years preceding Doe's rape. The proof in fact suggested that the office building itself was "high-crime" prone. In these circumstances, we are satisfied that lack of specific evidence as to the reputation of the surrounding area for criminal activity is without dispositive significance.

The district court contrasted the lack of evidence of crimes against persons in this case with the wealth of evidence introduced in *District of Columbia v. Doe* of prior criminal activity in the neighborhood and on the grounds of the school from which a fourth-grade student was abducted and then raped. Mem. op. at 9. Yet the D.C. Court of Appeals in *District of Columbia v. Doe* did not purport to establish a proof-of-other-crimes threshold as the sole entryway to a jury's consideration of foreseeability. Rather, the evidence of criminal activity in *District of Columbia v. Doe* was deemed sufficiently strong to render harmless the erroneous admission of evidence of sex offenses against students in other District of Columbia elementary schools, and the consequent development of guidelines designed to prevent future sex crimes. *See District of Columbia v. Doe,* 524 A.2d at 34–35 ("Given the weight of probative evidence presented to the jury, of crimes against persons in the neighborhood, and of crimes in and around the school, we conclude that the District's rights were not substantially affected [by the erroneous admission of the sex crimes and guidelines

evidence], and the jury's verdict was not substantially swayed by the error.").

The decision in *Graham* provides a better standard for assessing the quantum of proof necessary to send the issue of foreseeability to the jury. In that case, tenants and guests living in a two-family building sued the landlord "for injuries resulting from a fire deliberately set in the foyer of the building by the former paramour of one tenant." *Graham*, 424 A.2d at 104. The tenants had "frequently complained to the landlord about the absence of an outer door lock," and "explained to the rental agent that intruders and strangers entered the foyer through the open door and committed acts of vandalism, such as removing the lights or fuses." *Id.* One tenant "told the rental agent of an attempted burglary through her window," and both parties agreed the neighborhood was high in criminal activity. *Id.* at 105.

The trial court in *Graham* granted summary judgment for the landlord finding, as a matter of law, that "the landlord had no duty to foresee that a tenant's rejected lover would commit criminal arson." *Id.* at 104. The landlord, as appellee, argued in defense of the trial court's judgment that "the minor acts of trespass and vandalism in the foyer of which [the tenants] complained . . . are so different in scope from arson which caused the injuries that the prior events did not constitute notice." *Id.* at 105. The D.C. Court of Appeals reversed the summary judgment entered for the landlord. The appeals court concluded that "[w]hether the landlord could foresee the criminal activity which caused the injuries here is a question of fact" appropriate for determination by a jury. *Id.* The high crime neighborhood, the malfunctioning latch on the building's outer door, and the previous burglary attempt,[11] the D.C. Court of Appeals held, "create[d] a triable issue of fact as to whether the danger of a criminal assault by means of arson was sufficiently probable and predictable to cre-

ate a duty in the landlord to take reasonable precautionary measures." *Id.* at 106.

Under the "combination of factors" analysis enunciated in *District of Columbia v. Doe*, 524 A.2d at 33, and measured against the evidentiary threshold employed in *Graham*, 424 A.2d at 105–06, Doe presented evidence sufficient to allow the jury to decide whether the Bank was on notice of the danger to tenants' employees from assaultive criminal conduct by intruders at 1430 K Street. *See District of Columbia v. Doe*, 524 A.2d at 33–34. This evidence included: deficient building security—unsecured vacant floors and offices, freely accessible via unlocked stairwells and unprogrammed elevators; criminal or unauthorized conduct within the building, including a burglary at the Embassy of Djibouti, thefts of personal and office property, drug use, and sexual activity; and tenant complaints of threatening and aggressive intruders appearing in the building in the month immediately preceding the rape. The letters of Moreno and Mehling each expressed grave concern for the safety of employees, not merely the security of property, prompted by the presence of disturbing strangers in the building, and Moreno explicitly tied the potential danger posed by intruders to the lapses in building security. Even under D.C.'s "heightened showing of foreseeability," *see District of Columbia v. Doe*, 524 A.2d at 33, Doe's evidence created an issue on which "reasonable [people] might differ," precluding the entry of judgment as a matter of law for the Bank. *Graham*, 424 A.2d at 107.

### Standard of Care

■ The "standard of care which should be applied in judging if the landlord has fulfilled his duty of protection to the tenant . . . [is] reasonable care in all the circumstances." *Kline*, 439 F.2d at 485. "What measures are reasonable under the circumstances is determined by a jury assessment of protective measures taken in buildings

---

**11.** The court refers to this prior incident once as "an attempted burglary through [a tenant's] window," *Graham*, 424 A.2d at 105, and once as "a previous attempt at robbery through her window." *Id.* at 106. The circumstances so briefly described suggest that the event was probably a burglary rather than a robbery, in which case the record in *Graham* was also without evidence of any previous crime against a person in or around the leased premises.

of similar character and class." *Graham,* 424 A.2d at 106.

The Bank argues that "the vague and general testimony" of Anthony Potter, Doe's expert witness in commercial building security, was inadequate to establish the applicable standard of care. *See* Brief for Appellee at 49. Undoubtedly, specific reference to comparable buildings, or particularized citation of normative standards would have enhanced Potter's testimony. *See District of Columbia v. Carmichael,* 577 A.2d 312, 315–16 (D.C.1990) (finding expert testimony regarding inadequate security practices at Lorton failed to establish a standard of care by which the jury could measure D.C.'s conduct).

Potter testified about his extensive training, experience, and publications in the field of building security, his evaluation in "at least half a dozen" previous cases of "the security of commercial buildings and commercial properties here in the District of Columbia," and the preparation underlying the opinion he gave in Doe's case. In view of this foundation, Potter's testimony that the unsecured condition of vacant floors and offices at 1430 K Street fell below acceptable security practices in any commercial building in D.C. or anywhere else in the country sufficed to establish a standard of care by which the jury could measure the Bank's conduct.

### Conclusion

District of Columbia precedent, we conclude, supports recognition of a commercial landlord's duty to exercise reasonable care to protect tenants from foreseeable criminal conduct occurring in common areas within the landlord's control. We therefore affirm the denial of summary judgment for the Bank. We also affirm the denial of judgment for the Bank premised on Doe's alleged failure to establish an applicable standard of care: the testimony of Doe's expert witness, we agree, presented an adequate standard by which the jury could measure the Bank's conduct in providing security for tenants of 1430 K Street. The district court erred, however, in entering judgment for the Bank as a matter of law

on the issue of foreseeability. Doe presented evidence sufficient to create a jury question concerning the foreseeability of the tragic occurrence at 1430 K Street on May 24, 1989. We therefore reverse the district court's dispositive judgment for the Bank and remand the case for a full trial.

*It is so ordered.*

STEPHEN F. WILLIAMS, Circuit Judge, concurring.

I agree with the court that plaintiff showed that the rape was "foreseeable", as the District of Columbia courts have used the term in stating the conditions under which a landlord has a duty to use reasonable care in protecting tenants and others from crimes committed in areas under its control. But I must confess that I am unable to discern either the function of the foreseeability test, or its core meaning, in this context.

Foreseeability normally appears in two places in torts jurisprudence. First, the level of care that a person must take varies with the risks that are "foreseeable"—a term that in substance addresses probability. Thus, under Learned Hand's familiar formula conduct is negligent if the cost of the defendant's neglected preventive measure is less than the harm caused by the accident, discounted for its probability. *United States v. Carroll Towing Co.,* 159 F.2d 169 (2d Cir.1947). Second, the "proximate cause" inquiry is in part a determination whether the particular accident was "foreseeable", that is, likely enough to follow from the defendant's negligence to justify holding him responsible.

In both these settings the court or jury has some general guidance as to what level of foreseeability (or probability) to look for. In the first inquiry, once the fact finder identifies the "risk", probability comes in simply for discount purposes—a one-in-100,000 risk deserves more preventive effort than an otherwise equivalent one-in-a-million risk. Here, to be sure, the level of generality at which the risk is articulated will affect the probability. There was a virtual certainty that "something bad" would happen at 1430 K Street, a much

lower probability that a rapist would stop the elevator at the ninth floor and yank Ms. Doe off to rape her. But the Hand formula supplies some automatic correction against manipulation of the level of generality. If the plaintiff articulates the risk very broadly, the cost of prevention will rise to astronomic levels, tending to justify the defendant's conduct; if the defendant characterizes the risk very narrowly, the cost of prevention will fall, tending to render his level of care unreasonable.

Similarly, in the proximate cause inquiry, the requisite level of foreseeability flows from the nature of the rule: an accident is "unforeseeable" if it is so improbable that, even if actors are held liable for negligence that is a "but for" cause, they will not adjust their level of care in light of the expected liability; the gains in diminished liability are not worth thinking the problem through. See William M. Landes & Richard A. Posner, The Economic Structure of Tort Law 246 (1987); *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). As with the level of care inquiry, the degree of improbability derives from the purpose behind the rule.

Indeed, it seems quite conceivable that the old rule against liability for the criminal acts of third persons may have rested on an implicit judgment that crimes that could be prevented through the reasonable care of someone other than the perpetrator and victim were so flukey that liability would not affect levels of care. In other words, it may have represented a kind of categorical application of the intuition underlying the proximate cause requirement.

Here, however, it is not apparent how any particular degree of foreseeability flows from the requirement's role in determining liability. As Judge Ginsburg's excellent opinion indicates, most of the elements that would be relevant to considering probability for standard-of-care purposes—the character of the building and of the neighborhood, the condition of the premises, past occurrences of comparable events—are all thrown into the equation. Indeed, the only standard-of-care issue that seems to be excluded is the cost of preven-

tion. To include that would completely collapse the two inquiries.

Until the District of Columbia Court of Appeals says otherwise, it seems reasonable to see the foreseeability requirement as a vestige of the blanket rule against liability for the criminal acts of third parties. Though framed as an issue relating to "duty", it seems, so far as landlord liability for criminal acts in areas under his control is concerned, to perform no analytical work, but merges with the proximate cause analysis. In other contexts, of course, the duty requirement presumably continues to bar liability for the criminal acts of third parties.