# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 21, 2010         Decided August 17, 2010

No. 08-7137

DONALD WRIGHT SIGMUND,
APPELLANT

v.

STARWOOD URBAN RETAIL VI, LLC, ET AL.,
APPELLEES

v.

WOLF & COHEN LIFE INSURANCE, INC.,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-01366)

---

*Paul J. Cornoni* argued the cause for appellant. With him on the brief was *Patrick M. Regan*. *Thanos Basdekis* entered an appearance.

*Brian E. Hoffman* argued the cause for appellees Starwood Urban Retail VI, LLC, et al. With him on the brief were *Jeffrey R. Schmieler*, *Steven Roy Migdal*, and *Timothy E. Fizer*.

2

Before: GINSBURG, GARLAND, and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Solon, the ancient Athenian lawgiver, made no law against patricide because he thought it impossible that anyone could commit so unnatural a crime. Two and a half millennia later, Freud famously claimed the opposite -- that every son harbors murderous impulses toward his father. In this case, we side with the lawyer not the psychoanalyst. Donald Sigmund, the accidental victim of a car bomb that his half-brother intended for their father, cannot recover from the third-party defendants he has sued unless his half-brother's crime was foreseeable. We conclude that neither that crime nor any similar one was foreseeable, and thus affirm the district court's grant of summary judgment in favor of the defendants.

I

At approximately 2:00 p.m. on July 12, 2002, a pipe bomb exploded in a Chevrolet Blazer in which Donald Sigmund was sitting. Donald sustained serious injuries in the blast. The Blazer was owned by Donald's father, and Donald had gone to retrieve it from the basement garage of the building in which they worked in order to run an errand. In March 2003, Donald's half-brother, Prescott Sigmund, pled guilty to planting the bomb and was sentenced to 32 years' incarceration.

Like Donald, Prescott also had keys to his father's Blazer and, like his half-brother, he had also worked for some time at his father's office in the building at 5225 Wisconsin Avenue, N.W. For months, Prescott had been devising a plan to detonate a bomb that would kill his father, from whom he stood to inherit approximately $300,000. Prescott knew that his father kept the Blazer parked in the building's garage. The garage, which was

open to the public, was ordinarily secured by an overhead rolling steel garage door and guarded by attendants until about 10 p.m. The garage was also accessible from a staircase in the building's lobby, which was open to the public until about midnight.

Late in the evening of July 10, Prescott drove to the garage with the pipe bomb in his car. When he arrived, the overhead garage door, which had broken sometime shortly before June 24, was stuck in the open position. Prescott had noticed that the door was broken the day before. Notwithstanding the months he had invested in preparing the attack, he later described the broken garage door as "the opportunity . . . [he] had been looking for." Prescott Sigmund Dep. 12 (Feb. 2, 2006).

Prescott parked next to his father's Blazer, opened the Blazer with his own key, and -- within the space of approximately two hours -- planted the pipe bomb inside. The garage door was repaired on July 11, one day after Prescott planted the bomb. The Blazer then sat untouched until the following afternoon, when Donald came to retrieve it and suffered the blow intended for his father.

One year later, Donald filed suit in federal court, predicated on diversity jurisdiction, seeking tort damages from Prescott and the owner, managers, and operators of the garage. The district court granted summary judgment for the defendants other than Prescott, finding that Donald could not "meet the legal standard of a 'heightened showing of foreseeability' that is applied when an injury is caused by the intervening act of a third party." *Sigmund v. Starwood Urban Inv., et al.*, 475 F. Supp. 2d 36, 38 (D.D.C. 2007). Donald then dismissed his claims against Prescott and filed this appeal.

4

II

We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party, Donald Sigmund. *See Czekalski v. Peters*, 475 F.3d 360, 362-63 (D.C. Cir. 2007). We must affirm the grant if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

Because Sigmund brought this suit based upon diversity of citizenship, *see* 28 U.S.C. § 1332, we apply the law of the District of Columbia. *See Smith v. Wash. Sheraton Corp.*, 135 F.3d 779, 782 (D.C. Cir. 1998). "To establish negligence" under D.C. law, "a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 642 n.3 (D.C. 2005) (en banc) (internal quotation marks omitted).

In *Beretta*, the D.C. Court of Appeals, sitting en banc, summarized the analysis applicable "[w]here an injury is caused by the intervening criminal act of a third party":

> [T]his court has repeatedly held that liability depends upon a more heightened showing of foreseeability than would be required if the act were merely negligent. In such a case, the plaintiff bears the burden of establishing that the criminal act *was so foreseeable that a duty arises to guard against it*. Because of the extraordinary nature of criminal conduct, the law requires that the foreseeability of the risk be more precisely shown.

872 A.2d at 641 (quoting *Potts v. District of Columbia*, 697 A.2d 1249, 1252 (D.C. 1997)) (internal quotation marks omitted). "In this context," the court said, "the requisite duty of care required for negligence is a function of foreseeability, arising only when foreseeability is alleged commensurate with 'the extraordinary nature of [intervening] criminal conduct.'" *Id.* (quoting *Potts*, 697 A.2d at 1252) (footnote omitted).[1] Moreover, it noted, "'our opinions have made clear the demanding nature of the requirement of 'precise' proof of a 'heightened showing of foreseeability' in the context of an intervening criminal act involving the discharge of weapons.'" *Id.* at 642 (quoting *Potts*, 697 A.2d at 1252) (emphasis omitted).

In *Beretta*, the court reviewed several of its prior cases, which, it said, "demonstrate the tight boundaries . . . within which a claim of common-law negligence must be framed . . . 'in the context of an intervening criminal act involving the discharge of weapons.'" *Id.* at 643 (quoting *Potts*, 697 A.2d at 1252) (internal quotation marks and citation omitted). As the court explained, in *Potts v. District of Columbia* it sustained a grant of summary judgment against the plaintiffs, who had been injured by gunshots as they were leaving an event at the Washington Convention Center, because they had "proffered no evidence of any prior gun-related violence at any other event" held at the Center or planned by the event's promoters, "nor any other specific evidence bearing

---

[1]In *Workman v. United Methodist Committee on Relief*, this Circuit observed that, although ordinarily "foreseeability is important to issues of proximate causation and conformity to the standard of care, . . . the D.C. courts have repeatedly spoken of the heightened foreseeability requirement in terms of [the] duty" of care. 320 F.3d 259, 265 (D.C. Cir. 2003). *Beretta* acknowledged *Workman*'s observation, but saw "no need to reconsider that framework." *Beretta*, 872 A.2d at 642 n.4.

directly on the foreseeability of the shooting incident at issue." *Id.* (quoting *Potts*, 697 A.2d at 1252). In *Bailey v. District of Columbia*, 668 A.2d 817 (D.C. 1995), the court likewise affirmed a grant of summary judgment against a plaintiff who was shot as she was leaving a cheerleading competition at a junior high school. There was no evidence of prior gun-related violence or assaults at the school, and the court found insufficient the plaintiff's showing that "the neighborhood around the school was a 'high drug area' and that shootings and other criminal acts had taken place there." *Beretta*, 872 A.2d at 642 (citing *Bailey*, 668 A.2d at 820). "[S]uch 'generic information,' by itself," the court said, "does not create a duty on the part of the District to protect against the use of firearms under the circumstances presented here." *Id.* (quoting *Bailey*, 668 A.2d at 820). Finally, in *Clement v. Peoples Drug Store*, 634 A.2d 425 (D.C. 1993), the court affirmed a directed verdict against the widow of an employee who was shot to death in the parking lot of a store. "[T]he only evidence presented with respect to [the] shooting's foreseeability was an expert's opinion based on police reports of criminal activity in the surrounding area[,] . . . [and no] evidence was introduced involv[ing] any gun-related incidents at the particular shopping mall in which the shooting occurred." *Beretta*, 872 A.2d at 642 (quoting *Potts*, 697 A.2d at 1252) (internal quotation marks omitted). In all three of these cases, the Court of Appeals said, it "rejected liability as a matter of law where foreseeability (hence duty) was not limited by any evidentiary reference to a precise location or class of persons." *Id.*

The D.C. Court of Appeals has issued two opinions on this subject since *Beretta*, and both have emphasized the requirement of a heightened showing of foreseeability in cases involving intervening criminal acts. In *Bruno v. Western Union Financial Services, Inc.*, 973 A.2d 713, 721-22 (D.C. 2009), the court found that injuries the plaintiff sustained during a robbery inside

the defendant's gas station were not foreseeable. "There was no evidence," the court said, "that any offense in the nature of an assault had occurred previously inside the gas station," although there was evidence of a theft inside and of an armed assault just outside within the previous two years. *Id.* at 718-19.

The court's most recent decision, and the closest factually to the present case, is *Board of Trustees of the University of the District of Columbia v. DiSalvo*, 974 A.2d 868 (D.C. 2009), which involved a student who was attacked by armed assailants in a university parking garage. For the plaintiffs to succeed, the court said, "[i]t is not sufficient to establish a general possibility that the crime would occur, because . . . the mere possibility of crime is easily envisioned and heightened foreseeability requires more precision." *Id.* at 872-73. Rather, they must "establish that [the university] had an increased awareness of the risk of a violent, armed assault in the parking garage." *Id.* at 872. The court found the plaintiffs failed to meet that standard as a matter of law. *Id.* at 875. Although they alleged that security in the garage was inadequate, they "proffered no evidence that [the university] had received any complaints about the security of [its] parking garage." *Id.* at 873. And while they pointed to "several previous on-campus crimes," including three assaults, "none was committed with a weapon, none was in a campus parking garage, and none resulted in any serious injury to the victim." *Id.*

Finally, *DiSalvo* noted that, in "the few cases where [courts in the District of Columbia] have held that a defendant had a duty to protect the plaintiff from a criminal act[,] . . . the facts in evidence established that the defendant had reason to anticipate the type of particular criminal attack that actually occurred." *Id.* at 873. For example, "in *Kline v. 1500 Massachusetts Ave. Apartment Corp.*, 439 F.2d 477 (D.C. Cir. 1970), where the plaintiff was assaulted and robbed in the common hallway of her

apartment building just two months after another tenant was similarly attacked in the same hallway, the court found heightened foreseeability because 'the crimes of violence, robbery, and assault [ ] had been occurring with mounting frequency on the premises' and the landlord had been asked to secure the building in light of the crime." *Id.* at 873-74 (quoting *Kline*, 439 F.2d at 480). The court also distinguished *District of Columbia v. Doe*, 524 A.2d 30 (D.C. 1987), "where a young student was abducted from inside of her elementary school classroom and raped by an unknown intruder," on the grounds that there were "'crimes against persons in and around the school . . . ; sexual assaults and other violent activity in the surrounding area; and deficient school security [, including the] presence of adult males who freely roamed throughout the school." *DiSalvo*, 974 A.2d at 874 (quoting *Doe*, 524 A.2d at 34).[2] "In these cases," the court concluded, "the common thread is that the facts demonstrating heightened foreseeability showed, if not awareness of the precise risk, close similarity in nature or temporal and spatial proximity to the crime at issue." *Id.*[3]

---

[2]The court further distinguished *Doe* on the ground that, "[i]n addition to the evidence of criminal activity and lapsed security . . . , the victim was also entitled to a heightened duty of protection because she was a young child in public school over which the District of Columbia exercised custodial care, who was 'particularly vulnerable to the conduct that befell her,' and was 'taken from a place that we would expect to be a safe haven.'" *DiSalvo*, 974 A.2d at 874 n.4 (quoting *Bailey*, 668 A.2d at 821). In *Beretta*, the court described *Doe* as the "high-water mark" of its willingness to recognize a duty to protect against an intervening criminal act. 872 A.2d at 642.

[3]On the same grounds, *DiSalvo* distinguished two cases in which this Circuit, sitting in diversity, found sufficient evidence of heightened foreseeability. In *Doe v. Dominion Bank, N.A.*, 963 F.2d 1552 (D.C. Cir. 1992), where a woman was raped inside a building, *DiSalvo* noted that the rape took place "on an unsecured vacant floor

III

Sigmund cannot satisfy the heightened foreseeability standard required by the D.C. Court of Appeals. Although he need not show "previous occurrences of the particular type of harm" that befell him, he must show the defendants' "increased awareness of the danger of a particular criminal act." *DiSalvo*, 974 A.2d at 872 (quoting *Doe*, 524 A.2d at 33). "[I]n the context of an intervening criminal act involving the discharge of [a] weapon[]" -- and, a fortiori, of a pipe bomb -- the requirement of "precise proof of a heightened showing of foreseeability" is particularly demanding. *Beretta*, 872 A.2d at 643 (internal quotation marks omitted). As the court required in *DiSalvo*, Sigmund must "establish that [the defendants] had an increased awareness of the risk *of a violent, armed assault* in the parking garage." *DiSalvo*, 974 A.2d at 872 (emphasis added).

Needless to say, there is no history of car bombings at 5225 Wisconsin Avenue. *Sigmund*, 475 F. Supp. 2d at 40. Nor is there any history of "homicides, or assaults with intent to kill on the premises." *Id.* In fact, in the six-and-a-half years preceding the bombing, there were only four crimes reported in the garage,

---

. . . where other criminal activity had occurred and tenants had specifically warned the landlord about the potential danger posed by the lack of security, vacant floors, and unauthorized persons in the building." *DiSalvo*, 974 A.2d at 874 (citing *Dominion Bank*, 963 F.2d at 1555-56). Similarly, *DiSalvo* noted that in *Novak v. Capital Management & Development Corp.*, 452 F.3d 902 (D.C. Cir. 2006), the plaintiffs "were attacked by a group of men immediately outside of a club's alley entrance, the entrance lacked any security measures, and the club owner had increased awareness due to prior fights in and around the club, including repeated fights at the alley entrance." *DiSalvo*, 974 A.2d at 874 (citing *Novak*, 452 F.3d at 904).

none of which involved an assault of any kind.[4] And, of all of the crimes reported at the building during that period, only four were crimes against persons -- none involving "a violent, armed assault" resulting "in any serious injury to the victim," *DiSalvo*, 974 A.2d at 872-73. *See Sigmund*, 475 F. Supp. 2d at 40.[5] In 2001 and 2002, there were no crimes against persons reported at the building at all. *Id.*

Sigmund wants us to widen our focus beyond the garage and building to the surrounding area. Although District of Columbia cases certainly have done so, *see, e.g.*, *Doe*, 524 A.2d at 32, both *DiSalvo* and *Beretta* caution against opening the aperture too wide, *see DiSalvo* 974 A.2d at 874 (noting that, in cases finding "heightened foreseeability," the facts showed "close similarity in nature or temporal and spatial proximity to the crime at issue"); *Beretta*, 872 A.2d at 642 (noting that the court has rejected liability where the evidence was not limited "to a precise location or class of persons"). In any event, the evidence regarding violent assaults in the surrounding area is also thin. Sigmund identifies 503 crimes within a five-block radius of 5225 Wisconsin Avenue that were reported to the police during the two years preceding the bombing. Al Ortenzo, Security Expert Report 10. None of those was a murder or an attempted murder. Al Ortenzo Dep. 104 (Sept. 25, 2006). Of the 503 crimes, Sigmund identifies only one aggravated assault and ten assaults with a deadly weapon, *see* Al Ortenzo Aff. 20

---

[4] The crimes were: one theft of a car, two thefts from cars, and the destruction of a car window. *Sigmund*, 475 F. Supp. 2d at 40.

[5] These crimes consisted of: a robbery at gunpoint in the area behind the building, a customer in a retail store kicking an employee in the buttocks, an employee pushing a customer in the chest with his finger, and a person using his head to strike another person's head. *Sigmund*, 475 F. Supp. 2d at 40.

(Jan. 8, 2007); his evidence does not indicate that any "resulted in any serious injury to the victim," *DiSalvo*, 974 A.2d at 873.

Sigmund further proffers that "10 percent of the local crime occurred in parking lots and garages." Appellant's Br. 25. This statistic is just the kind of "generic information" about crime that the D.C. Court of Appeals has found insufficient to establish foreseeability. *Beretta*, 872 A.2d at 642 (quoting *Bailey*, 668 A.2d at 820) (internal quotation marks omitted). The conclusory statements of Sigmund's experts that crime in the garage should have been foreseeable[6] are similarly insufficient. *See DiSalvo*, 974 A.2d at 872-73.

Citing *Dominion Bank*, Sigmund argues that, in addition to evidence of prior incidents, "'the condition of the premises is a critical factor in assessing the foreseeability of criminal conduct.'" Appellant's Br. 14 (quoting *Dominion Bank*, 963 F.2d at 1559). Here, he argues, the overhead door had been stuck open for approximately three weeks, creating "a gaping hole in the building's security." *Id.* at 16. Sigmund maintains that this condition, in combination with the history of criminal incidents, was sufficient to satisfy the requirement of heightened foreseeability.[7]

---

[6]*See, e.g.*, Al Ortenzo Aff. 18 (averring that there was "reasonable notice of the high risk of future criminal acts" and "future violent crime" on the property); James Womack Dep. 99 (averring that the defendants "should have been able to foresee any incidence of someone . . . entering the premises to do harm, bodily or physically").

[7]*Cf. DiSalvo*, 974 A.2d at 872 (stating that "heightened foreseeability 'does not require previous occurrences of the particular type of harm, but can be met instead by a combination of factors which give defendants an increased awareness of the danger of a particular criminal act'" (quoting *Doe*, 524 A.2d at 33)).

As *DiSalvo* explained, however, *Dominion Bank* was a case in which the crime occurred in a location "where other criminal activity had occurred and tenants had specifically warned the landlord about the potential danger posed by the lack of security." *DiSalvo*, 974 A.2d at 874; *see Dominion Bank*, 963 F.2d at 1561 (noting that "the Bank had incessant notice of criminal activity -- including theft, burglary, drug use, and possibly prostitution" at the building). The same was true in the other cases Sigmund cites as focusing on the condition of the premises as a factor in foreseeability.[8]

Sigmund produced no evidence of crime in the garage while the door was broken, and no evidence that tenants had complained about the door's condition. Nor were there security complaints or requests of any kind for more than a year before the bombing. *See Sigmund*, 475 F. Supp. 2d at 40; Thomas Updike Dep. 62-63 (Nov. 9, 2004); Constance Collins Dep. 165-66 (July 30, 2004). We also agree with the district court that "the fact that the garage was ordinarily readily accessible through the . . . lobby undercuts plaintiff's argument that the

---

[8]*See DiSalvo*, 974 A.2d at 873 (stating that in *Kline*, "'crimes of violence, robbery, and assault [ ] had been occurring with mounting frequency on the premises' and the landlord had been asked to secure the building in light of the crime" (quoting *Kline*, 439 F.2d at 480)); *Spar v. Obwoya*, 369 A.2d 173, 177 (D.C. 1977) (noting that "there was evidence of . . . individual apartment units of the building being burglarized by forcible entry from the common hallway," as well as "complaints [by] the tenants"). In *DiSalvo* itself, the court rejected the import of the plaintiffs' claims of inadequate garage security, noting that none of the crimes they detailed were committed in a campus parking garage, that they "proffered no evidence that [the university] had received any complaints about the security of [the] parking garage," and that the one request for more security it had received "was routine and pro-active, . . . not in response to any specific security concerns." 974 A.2d at 873.

broken garage door made the bombing more foreseeable." 475 F. Supp. 2d at 47.[9]

Finally, Sigmund maintains that there was a "special relationship" between him and the defendants, which justifies application of the "sliding scale" described by the Court of Appeals in *DiSalvo*. There, the court said that "the relationship between the defendant and plaintiff and the defendant's liability to the plaintiff can be viewed on a 'sliding scale,' whereby a relationship entailing a greater duty of protection may require a lesser showing of foreseeability in order for liability to attach." *Id.* at 872 (citing *Workman v. United Methodist Comm. on Relief*, 320 F.3d 259, 264 (D.C. Cir. 2003)). But *DiSalvo* expressed doubt that the defendant university in that case owed its "adult, commuter students" such a "heightened duty of protection," *id.*, and the relationship Sigmund claims to the defendants here seems no more significant. In any event, *DiSalvo* held that, "even if the relationship . . . did entail a greater duty of protection," finding the defendant liable "would still require a heightened showing of foreseeability greater than" the *DiSalvo* plaintiffs had shown. *Id.* Because Sigmund has made a weaker showing than those plaintiffs did, "there is no genuine issue as to any material fact and . . . the [defendants are] entitled to judgment as a matter of law," FED. R. CIV. P. 56(c).

---

[9]Because the district court disposed of the case on the ground that Sigmund failed to show foreseeability as a matter of law, we do not address the defendants' contention that he also failed to show that the condition of the garage door was a proximate cause of his injuries because access to the garage was available through the lobby. *See Sigmund*, 475 F. Supp. 2d at 48; *id.* at 39 & n.3.

14

IV

For the foregoing reasons, the judgment of the district court is

*Affirmed*.