GINSBURG, Chief Judge,
dissenting.
The Court today holds the District of Columbia violated the substantive component of the Due Process Clause of the Fifth Amendment to the Constitution of the United States based upon a murder that, as far as the evidence shows and common sense dictates, the District could neither have foreseen nor, by taking reasonable precautions, prevented. I therefore join neither the opinion nor the judgment of the Court.
I. Background
The evidence, viewed most favorably to the appellee, tells a story that is not especially complex. Tron Lindsey ran away from home at the age of 15 and thereafter lived on his own for about two years, during which time he kept out of trouble with the law. In 1998, Lindsey, then 17, was arrested for assault, adjudged a delinquent, and placed in the District’s Oak Hill Youth Center.
The following year his case was assigned to Joyce Bradford, a Superior Court probation officer, who found Lindsey “wanted to complete his education” and was “pursuing his GED at Oak Hill”; had “very limited court involvement”; and “very much wanted to be independent, because he had lived in the community for approximately two years on his own.” Bradford concluded it was not feasible to place Lindsey with either his mother or his grandmother, Minnie Smith. Accordingly, she recommended, and the court agreed, that Lindsey be placed in a supervised independent living program, which would enable him both to complete his education and to get a job.
*105 Lindsey was enrolled in the program run by Educational Solutions Academy (ESA) at the Queenstown Apartments in Prince George’s County, Maryland, in March 1999, three months before his 18th birthday. Lindsey’s participation in the program appeared to pay immediate dividends: He entered a program at Covenant House for at-risk youth; met with an on-site social worker; scheduled an independent study program; and filled out job applications. To be sure, Lindsey’s performance was not unblemished: He often left his study program early and regularly failed to return to his apartment before his curfew of 7:00 p.m. Those infractions, however, went neither unnoticed nor unaddressed by ESA and nothing in the record suggests Lindsey transgressed in any way that might have endangered his life. To the contrary, the record shows Lindsey, nearly an adult, was succeeding admirably in an independent living environment when he was murdered.
Unfortunately we know little about Lindsey’s murder. Lindsey and his roommate were found dead in their apartment on April 29, 1999, each with a single gunshot to the head fired from a gun with a crude silencer attached. The assailant, whose identity remains unknown, was admitted to the apartment without the use of force. Significantly, the police concluded the murder was targeted but they could not confidently determine whether the target was Lindsey or his roommate, and the evidence in this case sheds no light upon that question.
Lindsey’s grandmother, Minnie Smith, acting on behalf of his estate, sued ESA, the Queenstown Apartments, the District of Columbia and the District employee who ran the Youth Services Administration, which oversaw the independent living program, seeking damages under 42 U.S.C. § 1983 for a violation of substantive due process and for negligence under the common law of the District. The jury, finding the District and ESA had both violated the due process clause and been negligent, awarded Smith $72,000 in damage. The Queenstown Apartments and the District employee were held not liable.
II. Analysis
On appeal the District argues Smith failed to prove both her constitutional and her common law claims. Because, as the Court notes, Court Op. at 9, each claim would individually support the entire award of damages, I consider them both.
A. The Due Process Claim
In order to prove her claim under the due process clause, Smith must establish (1) the District owed Lindsey a duty of care; (2) the District breached that duty by an act exhibiting deliberate indifference to Lindsey’s well-being “so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,” County of Sacramento v. Lewis, 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); and (3) a District policy or custom was the “moving force behind the alleged constitutional violation,” which requires showing either that Lindsey’s murder was foreseeable or that it was not “highly extraordinary in retrospect,” Parker v. Dist. of Columbia, 850 F.2d 708, 714 (D.C.Cir.1988).
1. The District’s Duty
In ordinary circumstances “the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.” Lewis, 523 U.S. at 849, 118 S.Ct. 1708. “[W]hen the State takes a person into its custody and holds him there against his will,” however, the sub *106 stantive component of the due process clause “imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.” DeShaney v. Winnebago County Dep’t of Social Servs., 489 U.S. 189, 199-200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). More specifically, “when the State ... so restrains an individual’s liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs ... it transgresses the substantive limits on state action” set by the Constitution. Id. at 200, 109 S.Ct. 998.
I agree with the Court that, because he was required to live at the Queenstown Apartments, Lindsey was to that extent in the “custody” of the District, and the District therefore owed him a “corresponding duty.” Because there are degrees of restraint within the concept of custody, the duty imposed by the Constitution is also one of degree: If the restraint of a person’s liberty is tight, then the duty of the state to provide for his well-being is correspondingly elevated, cf. Taylor By and Through Walker v. Ledbetter, 818 F.2d 791, 797 (11th Cir.1987) (en banc) (“foster children [are] under the umbrella of protection afforded by the fourteenth amendment” because they are “isolated” and “helpless”; without “investigation, supervision, and constant contact ... a child placed in a foster home is at the mercy of the foster parents”), whereas if the restraint is loose, then the duty is correspondingly lower, cf. D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1373 (3d Cir.1992) (en bane) (“compulsory attendance laws [do] not liken school children to prisoners and the involuntarily committed, both of whom are unable to provide for their own basic human needs”).
With this proportionality in mind, I agree with the District’s observation that ESA, when it constrained Lindsey to live in the Queenstown Apartments, hardly “rendered] him unable to care for himself.” Lindsey sought out the program precisely in order to enjoy the freedom it offered — to go to school, to get a job, and to live independently — and Ms. Bradford recommended he be placed in the program because he was not in need of a more restrictive regimen. It is also worth recalling that when Lindsey began the program he was well-nigh an adult and had already lived on his own for two years; while living at the Queenstown Apartments, from which he would be able to come and go for school and work, Lindsey was not a helpless ward of the District. To be sure, Lindsey was not free to quit the program, as the Court repeatedly points out, Court Op. at 91, 94, and 96, but that establishes only that he was in custody' — not that he was so restrained that the District had a duty to guard him against any and all harms, including his improbable targeted murder. See DeShaney, 489 U.S. at 201, 109 S.Ct. 998 (“While the State may have been aware of the dangers [the youth] faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them”); Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 162 N.E. 99, 100 (1928) (“The risk reasonably to be perceived defines the duty to be obeyed”).
2. Deliberate Indifference
Nor did Smith prove the District exhibited such “deliberate indifference” to Lindsey’s welfare as to “shock the contemporary conscience.” Fraternal Order of Police Dep’t of Corrs. Labor Comm. v. Williams, 375 F.3d 1141, 1145 (D.C.Cir.2004).* Smith'argues the District showed *107 such indifference because it “fail[e]d to develop and issue any standards ... to govern the [ESA program].” That, however, is barely relevant to whether the District breached its duty to Lindsey. A standard may facilitate consistent deci-sionmaking, but it does not follow that ad hoc decisions are necessarily reckless. The truly relevant inquiry is whether the District made any ad hoc decision that exhibited deliberate indifference to Lindsey’s well-being.
Smith’s allegations regarding the District’s selection of ESA as a provider are also largely irrelevant There is record evidence ESA was not experienced in operating an independent living program but Smith must still show ESA took or failed to take some action that exhibited deliberate indifference to the enrollees’ safety, as it is entirely possible ESA, although inexperienced, ran the program adequately. Smith’s contention that ESA failed to enforce Lindsey’s curfew does not suffice because the record establishes ESA docked Lindsey’s allowance in an attempt to deter curfew infractions.
The only relevant decisions identified by the Court are the District’s approval of ESA’s selection of the Queenstown Apartments to house program enrollees and its failure to monitor crime at the Queenstown Apartments. As for the site selection process, the Queenstown Apartment complex was chosen because it was a “blue collar community” in a “pretty decent neighborhood” that was “family-oriented,” and near the amenities necessary for independent living Indeed, an ESA director had lived within walking distance of the Queenstown Apartments for five years. Smith’s key witness testified only that the site selection process should have been more “thorough.” But surely deliberate indifference, like ambition, must be made of sterner stuff.
In any event, it is silly to suggest the District showed deliberate indifference to Lindsey’s safety by approving Lindsey’s placement at the Queenstown Apartments, which has 1,067 units, presumably rented to householders who — apart from the ESA participants in eight or nine apartments— had chosen to live there. Does Smith, or for that matter the Court, truly mean to suggest that any parent who housed his or her family in that complex exhibited deliberate indifference to their well-being? That seems the unavoidable implication of the plaintiffs argument.
Smith also says the complex was “inundated” with violent crime around the time of Lindsey’s murder, which the District would have known had it monitored the ESA program more closely. As a foundation for this assertion Smith points to all of seven robberies and assaults committed at the complex during the seven months October 1998 through April 1999, including one robbery of an ESA participant. The record makes clear, however, ESA did not turn a blind eye to the crime against the ESA participant; rather, it assisted him in reporting the crime to the police despite some evidence suggesting it was staged. The remaining six crimes, spanning a peri *108 od of seven months, could hardly have put either ESA or the District upon notice of any heightened need to guard Lindsey against violent crime. After all, the jury found the Queenstown Apartments was not liable for Lindsey’s murder, presumably because Queenstown residents enjoyed a reasonable level of security.*
In the final analysis, regardless whether the selection of a site could have been more “thorough” or the District could have monitored crime at the complex more closely, it is obvious the District’s actions did not amount to an “executive abuse of power ... which shocks the conscience.” Williams, 375 F.3d at 1145.
3. Moving Force
Even if the District had breached its duty to care for Lindsey, Smith’s claim would still fail because any such breach was not the “moving force” behind Lindsey’s murder. As thq Court notes, Court Op. at 102, we have equated that requirement with proximate causation, which means “the particular [wrong] was ‘foreseeable’, that is, likely enough to follow from the defendant’s [breach] to justify holding him responsible.” Doe v. Dominion Bank of Wash., N.A., 963 F.2d 1552, 1563 (D.C.Cir.1992) (Williams, J., concurring). Whether a particular harm is foreseeable ordinarily turns upon the level of generality at which the harm is defined, but Smith cannot sustain her burden of proof even at a high level of generality because there is no evidence in the record regarding the cause of Lindsey’s murder: We do not know who killed him or why. It is therefore fanciful to maintain his murder was a foreseeable result of the District’s failure to enact standards for independent living programs, or to monitor crime levels at the Queenstown Apartment complex more closely, or of ESA’s failure more strictly to enforce Lindsey’s 7:00 p.m. curfew. Indeed, the little we do know about Lindsey’s murder suggests that no reasonable program standards and not even perfect curfew observance would have made his untimely death any less likely. Nor does it seem Lindsey’s death by an assassin whom he or his roommate admitted into their apartment at 11:00 p.m. could have been prevented by any reasonable security measure.
Taking a wider view, we see also that Lindsey had no significant criminal history, had no known involvement with any dangerous activity, and seemed to be bene-fitting from the ESA program. Not even with 20-20 hindsight can one connect any nonfeasance on the part of the District to Lindsey’s becoming the victim of a targeted murder — and of course, the District is to be held to a standard of reasonable foresight, not of hindsight. Cf. Martinez v. California, 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) (state did not violate due process clause when parole *109 board released prisoner who five months later committed murder because that was “too remote a consequence of the parole officers’ action”).
B. The Negligence Claim
Smith’s claim under D.C. law fails for one of the same reasons her claim under the Constitution fails. “The elements of a common law action for negligence are (1) a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty by the defendant, and (3) damage to the plaintiff, proximately caused by the breach of duty.” Powell By and Through Ricks v. Dist. of Columbia, 634 A.2d 403, 406 (D.C.1993). With regard to the duty the District owed Lindsey, it is settled D.C. law that “a defendant may be liable for harm caused by the criminal act of another only if the crime was particularly foreseeable.” Workman v. United Methodist Comm. on Relief, 320 F.3d 259, 262 (D.C.Cir.2003) (emphasis added). This is a “heightened” standard of foreseeability, which ordinarily may not be satisfied with “generic information such as crime rates.” Id. Moreover, because of the “sliding scale” reflected in D.C. case law, the District owed Lindsey only a basic duty of care — for the same reason it owed him only a basic duty of care under the Constitution — Smith must adduce “specific evidence of foreseeability.” Id. at 264.
As we have seen, Smith has not satisfied the ordinary requirement of foreseeability necessary to establish proximate causation, let alone the heightened standard of foreseeability a plaintiff must meet under D.C. law in order to hold one party responsible in damages for the criminal act of another. The District was not on notice that Lindsey was generally in danger, and Smith points to no specific evidence that he was in peril of being the victim of a targeted murder. Accordingly, Smith’s negligence claim against the District should fail.
III. Conclusion
Even under the deferential standard we accord a jury verdict, it should be apparent that Smith has proven neither her constitutional claim for due process nor her common law claim for negligence. That her grandson was murdered is a tragedy. Why it happened is a mystery. But this much is certain: The District was not deliberately indifferent to Lindsey’s well-being, nor could it have foreseen he would be executed by an assassin. I therefore respectfully dissent.

 The Supreme Court has held that "in a due process challenge to executive action, the *107 threshold question is whether the behavior of the governmental officer ... may fairly be said to shock the contemporary conscience.” Lewis, 523 U.S. at 847 n. 8, 118 S.Ct. 1708. "Whether the point of the conscience shocking is reached when injuries are produced with culpability ... following from something more than negligence but less than intentional conduct ... is a matter for closer calls." id. at 849, 118 S.Ct. 1708. Because not every instance of deliberate indifference may fairly be "condemned as conscience shocking,” id. at 850, 118 S.Ct. 1708, the question here is whether the District exhibited deliberate indifference to Lindsey's well-being and if so, whether that indifference is shocking to the “contemporary conscience.”

 For perspective, note that if we make the conservative assumption that only 2,000 people inhabited the 1,067 units at the apartment complex, then Smith's data show the probability of a Queenstown resident being the victim of a violent crime over a one-year period was .6%, or one in 166. Meanwhile, the average resident of the District faced almost three times that risk (1.6%), or one in 62. According to the D.C. Metropolitan Police Department, in 1999 residents of the District were the victims of 8,449 violent crimes— homicides, forcible rapes, robberies, and aggravated assaults, see Citywide Crime Statistics, Annual Totals, 1993-2004 available at http://mpdc.dc. gov/mpdc/cwp/vi ew,a,1239,q, 547 256,mpdcNav_GID, 1556.asp, at a time when, according to the D.C. Office of Planning, the District had a population of 519,000. Population and Rates of Selected Components of Change, April 1990-July 1999 available at http://www.dcli brary.org/sdc/p op-comp-change- rate.html. Accordingly, a District resident faced a 1.6% probability (8,449 -5- 519,-000 = 0.016) of being the victim of a violent crime that year.